WO

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Matthew Maxwell,

                    Plaintiff,

v.

Verde Valley Ambulance Company
Incorporated,

                    Defendant.

No. CV-13-08044-PCT-BSB

**ORDER**

In this employment case,[1] Plaintiff Matthew Maxwell (Plaintiff or Maxwell) alleges that Defendant Verde Valley Ambulance Company (Defendant or VVAC) discriminated against him based on disability, in violation of the Americans with Disabilities Act of 1990 (ADA) and the Rehabilitation Act, by terminating his employment and by failing to provide reasonable accommodations. (Doc. 1.) Plaintiff also alleges that VVAC retaliated against him for engaging in protected activity. (*Id.*) Finally, Plaintiff alleges that VVAC violated the Genetic Information Nondiscrimination Act of 2008 (GINA) by acquiring genetic information in an employment medical examination. (*Id.*)

Defendant VVAC has moved for summary judgment on Plaintiff's ADA and Rehabilitation Act claims (Counts 1 – 6). (Doc. 40.) Defendant asserts that Plaintiff cannot establish a prima facie case under the ADA or the Rehabilitation Act because he is

---

[1] The parties consented to magistrate judge jurisdiction under 28 U.S.C. § 636, and this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331.

not disabled as defined in those Acts and, therefore, Defendant is entitled to judgment as a matter of law.  (*Id.*)  Defendant also asserts that even if Plaintiff established disability, his claims would nonetheless fail as a matter of law because his employment was not terminated because of any disability and, therefore, he cannot establish causation for his discrimination and retaliation claims.  Defendant also moves for summary judgment on Plaintiff's GINA claim (Count 7), arguing that it did not improperly acquire any genetic information.  Finally, Defendant moves for summary judgment because it argues that there is no evidence to support an award of punitive damages.  (Docs. 37, 38.)

Plaintiff has also moved for summary judgment.  He asserts that he is disabled as a matter of law under the ADA and Rehabilitation Act and, therefore, the Court should enter partial summary judgment in his favor on the issue of his disability under the statutes.  (Doc. 37.)  Plaintiff also moves for summary judgment on his GINA claim because he argues that VVAC acquired genetic information.  (*Id.*)  For the reasons below, the Court denies Defendant's motion in part, and grants it in part, and denies Plaintiff's motion.

## I.    Factual Background

In 2000, several years before Plaintiff worked for VVAC, he was in a motorcycle accident and suffered injuries to several ligaments, tendons, nerves, and bones in his left leg (leg injury).  (PSOF ¶¶ 3-4.)[2]  Plaintiff currently takes over-the-counter medications (Motrin) on a regular basis and does a weekly home exercise program.  (PSOF ¶ 12.)  Plaintiff asserts that he has drop foot, a limp, and regularly "trips over his toes."  (PSOF ¶¶ 9, 17.)  He also uses a knee brace whenever he "expects that there is above average danger that he could injure himself, step wrong, twist wrong, or do anything else that concerns him."  (PSOF ¶ 11.)  Plaintiff complains of "pain, inflammation, crepitus, drop foot, lack of range of motion, [muscle atrophy], [numbness] in his lower extremity, phantom nerve pains, and [hammertoe]."  (PSOF ¶ 13.)  Plaintiff states that he can only participate in activities that require the use of his legs for a limited amount of time due to

---

[2] Citations to "PSOF" are to Plaintiff's Statement of Facts located at docket 38.

restricted blood flow, swelling, and pain.  (PSOF ¶ 14.)  He also states that he is at risk of injuring himself if he does not pay attention to how he steps.  (*Id.*)

In 2005, Plaintiff started working at VVAC as a reserve paramedic.  (PSOF ¶ 2; DSOF ¶ 3.)[3]  He was later promoted to the position of captain paramedic (Captain).  (Doc. 1 at 2.)  In January 2011, VVAC EMS Chief Kim Moore discovered that Plaintiff had used a VVAC computer assigned to the three captain paramedics (Captains' computer) to create a business plan for a medical marijuana business, Verde Valley Medicinal Supply (VVMS).  (DSOF ¶¶ 5-6.)  On January 6, 2011, Moore met with Plaintiff and advised him that his activities violated VVAC's policies prohibiting personal use of company property.  (DSOF ¶ 7.)  Moore directed Plaintiff to remove the VVMS documents from the VVAC computer.  (DSOF ¶¶ 9-10.)  Moore prepared a memorandum confirming her meeting with Plaintiff.  (DSOF ¶ 8.)

On January 26, 2011, VVAC Board Chair, Allen Muma, sent Plaintiff a letter regarding his business activities.  (DSOF ¶ 12.)  Muma advised Plaintiff that the VVAC Board of Directors was opposed to any VVAC employee being involved in a medical marijuana business.  (DSOF ¶ 13)  Muma stated that Plaintiff would be "terminated immediately" if VVAC obtained additional information that Plaintiff was still involved in a medical marijuana business.  (DSOF ¶ 14.)

In April 2011, Plaintiff failed to provide a required report for two months.  (DSOF ¶ 15.)  Moore issued Plaintiff a letter of reprimand stating that he had failed to complete his responsibilities as a Captain and that she was reassigning the task of preparing the report for "pre-hospital" to another Captain.  (DSOF ¶ 17.)

In May 2011, VVAC moved into a new building.  (DSOF ¶ 20.)  VVAC asserts that shortly after moving into the new building, Moore found computer files related to VVMS on the Captains' computer and that these files were not the same files she found in January 2011.  (DSOF ¶ 23; Doc. 41, Ex. 1 at 45, 84-85.)  VVAC asserts that Moore

---

[3]  Citations to "DSOF" are to Defendant's Separate Statement of Facts located at docket 41.

1    decided to terminate Plaintiff's employment upon that discovery.  (DSOF ¶ 24.)  During
2    that same time, Moore learned that Plaintiff had been telling co-workers that he was
3    going to sue VVAC if he fell down the stairs due to an alleged disability.  (DSOF ¶ 25)
4    Moore discussed this issue with Plaintiff on May 16, 2011 and he advised her that he was
5    disabled as a result of his leg injury and that he needed a first-floor bedroom.  (DSOF
6    ¶ 26.)

7         Moore consulted with Muma about Plaintiff's employment.  (DSOF ¶ 28.)  Moore
8    told Muma that Plaintiff claimed to have a disability.  (Muma depo. at 15.)[4]  Muma
9    advised Moore that they should send Plaintiff to a physician to determine if he was
10   disabled before proceeding with termination proceedings.  (*Id.*)  Muma stated that he
11   concluded that Moore had already decided to terminate Plaintiff when she met with
12   Muma in May 2011.  (Muma depo. at 45.)

13        On May 30, 2011, after meeting with Muma, Moore sent Plaintiff to Scott D.
14   Bingham, D.O., at Verde Valley Urgent Care to determine whether Plaintiff was qualified
15   to engage in his work duties.  (PSOF ¶ 21; DSOF ¶ 27.)  Dr. Bingham noted that Plaintiff
16   had good motor function in both legs, did not display any difficulty or a limp walking,
17   and he had no difficulty stepping onto a stool with either leg.  (Bingham depo at 30;
18   DSOF ¶¶ 33-34.)[5]  Dr. Bingham opined that Plaintiff could perform the functions of his
19   job.  (DSOF ¶ 38.)  On June 1, 2011, Dr. Bingham sent VVAC a letter reporting his May
20   30, 2011 examination.  (DSOF ¶ 39.)  The letter stated that Plaintiff had been in an
21   accident in 2000 but was currently in "good physical condition" and could "perform his
22   current job with no limitations."  (DSOF ¶ 40.)

23        After Moore received Dr. Bingham's letter, she terminated Plaintiff on June 1,
24   2011.  (DSOF ¶ 42.)  VVAC asserts that it terminated Plaintiff based on Moore's
25   discovery of VVMS documents on a VVAC computer in May 2011, Plaintiff's past

---

26

27        [4]  The Court's citation to "Muma depo." is to the transcript of Muma's August 8, 2013 deposition, located at exhibit 7 to docket 41.

28        [5]  The citation to "Bingham depo" is to the transcript of Bingham's November 5, 2013 deposition, located at Exhibit 8 to docket 41.

1    disciplinary issues, and dissension caused by Plaintiff's threats to fall down the stairs and

2    sue VVAC.  (DSOF ¶ 41.)

3    **II.    Summary Judgment Standard**

4        A party seeking summary judgment "bears the initial responsibility of informing

5    the district court of the basis for its motion, and identifying those portions of [the record]

6    which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*

7    *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the

8    evidence, viewed in the light most favorable to the nonmoving party, shows "that there is

9    no genuine issue as to any material fact and that the movant is entitled to judgment as a

10   matter of law."  Fed. R. Civ. P. 56(a).  Only disputes over facts that might affect the

11   outcome of the suit will preclude the entry of summary judgment, and the disputed

12   evidence must be "such that a reasonable jury could return a verdict for the nonmoving

13   party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

14   **III.   "Disability" under the ADA and Rehabilitation Act**

15       The parties have filed cross motions for summary judgment arguing that they are

16   entitled to judgment as a matter of law on the issue of disability.  For his failure to

17   accommodate and discrimination claims under the ADA and Rehabilitation Act (Counts

18   1, 2, 4 and 5), Plaintiff must establish that he has a disability, as defined in these statutes.[6]

19   _____

20       [6]  The ADA prohibits a covered employer from discriminating "against a qualified
21   *individual with a disability* because of the disability of such individual in regard to . . .
     [the] terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a) (emphasis
22   added).

23       Under the ADA, the term "discriminate" includes "not making reasonable
     accommodations to the known physical or mental limitations of an otherwise qualified
24   *individual with a disability* who is an applicant or employee, unless [the employer] can
     demonstrate that the accommodation would impose an undue hardship on the operation
25   of the [employer's] business."  42 U.S.C. § 12112(b)(5)(A) (emphasis added).

26       The Rehabilitation Act also prohibits employers from discriminating against their
     employees on the basis of disability.  *Nimi-Montalbo v. White*, 243 F. Supp. 2d 1109,
27   1121 (D. Haw. 2003.)  The standards applied under the Rehabilitation Act are the same as
     those applied under the ADA, except that the plaintiff must also prove that the defendant
28   receives federal financial assistance.  *See* 29 U.S.C. § 791(g); 29 C.F.R. § 1614.203(a);
     *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002).  VVAC does not dispute that
     it receives federal financial assistance.

1    To establish a prima facie case of discrimination under the ADA, a plaintiff must
2    show that he: (1) is "disabled" within the meaning of the statute; (2) is a "qualified
3    individual" (he is able to perform the essential functions of his job, with or without
4    reasonable accommodations); and (3) suffered an adverse employment action because of
5    his disability. *See Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th
6    Cir. 2012) (citing 42 U.S.C. § 12112(a), (b)(5)(A) (requiring reasonable
7    accommodation)).

8    Defendant acknowledges that Plaintiff was "qualified" and does not dispute that
9    termination is an "adverse employment action." (Doc. 40 at 7.) Instead, Defendant
10   argues that the undisputed facts establish that Plaintiff does not have a disability.
11   Plaintiff argues the opposite, that the undisputed facts establish that he does have a
12   disability. As set forth below, the Court finds that there are disputed issues of fact
13   regarding Plaintiff's alleged disability and denies both motions for summary judgment on
14   this issue.

15   **A.    The Definition of "Disability" under the ADA**

16   The ADA defines disability as: "(A) a physical or mental impairment that
17   substantially limits one or more major life activities of such individual;[7] (B) a record of
18   such an impairment; or (C) being regarded as having such an impairment (as described in
19   [42 U.S.C. § 12102](3))." 42 U.S.C. § 12102(1). Plaintiff argues that his leg injury
20   substantially limits the major life activity of walking. (Doc. 37 at 4.) VVAC does not
21   dispute that Plaintiff's leg injury constitutes a physical impairment or that walking is a
22   major life activity under the ADA. (Doc. 40 at 8-11.) Rather, VVAC argues that
23   Plaintiff failed to provide sufficient evidence that his leg injury substantially limited his
24   ability to walk at the time of his termination in June 2011. (Doc. 40 at 8-11.)

---

27   [7] "[M]ajor life activities include, but are not limited to, caring for oneself,
28   performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

1    Because the alleged discrimination occurred in 2011, after the effective date of the

2    ADA Amendments Act of 2008 (ADAAA), the statute applies to this case.  The ADAAA

3    expanded the scope of the term "disability" in the ADA.  *See Rohr v. Salt River Project*

4    *Agric. Improvement & Power Dist.*, 555 F.3d 850, 861 (9th Cir. 2009).  Thus, "disability"

5    is construed to allow coverage to the "maximum extent" allowed by the ADA and the

6    ADAAA.  *Id.*; *see also Karr v. Napolitano*, 2012 WL 4462919, at *8 (N.D. Cal. Sept. 25,

7    2012) (stating that the "ADAAA seeks to broaden the scope of disabilities covered by the

8    ADA after that scope had been narrowed by Supreme Court interpretation.").

9    In *Rohr*, the Ninth Circuit explained that the phrase "substantially limits" had been

10   interpreted as requiring a greater degree of limitation than Congress intended, and that

11   limitations should be evaluated without considering the ameliorative effects of corrective

12   measures or devices (such as medication, medical supplies, equipment, or appliances).

13   *Id.* at 861-62; *see also* 29 C.F.R. § 1630.2(j)(1)(iv) ("[T]he term 'substantially limits'

14   shall be interpreted and applied to require a degree of functional limitation that is lower

15   than the standard for 'substantially limits' applied prior to the ADAAA").  Because there

16   is no dispute that Plaintiff's leg injury constitutes a physical impairment or that walking

17   is a major life activity under the ADA, to determine whether Plaintiff was disabled at the

18   time of his termination, the Court applies the "substantially limits" test under the

19   ADAAA.

20   **B.      The "Substantially Limits" Test of the ADAAA**

21   The term "substantially limits" is "construed broadly in favor of expansive

22   coverage" and "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i);

23   *see also* 42 U.S.C. § 12102(4)(A-C).  An impairment "need not prevent, or significantly

24   or severely restrict, the individual from performing a major life activity in order to be

25   considered substantially limiting."   29 C.F.R. §1630.2(j)(1)(ii).  Although courts are to

26   make "an individualized assessment," 29 C.F.R. § 1630.2(j)(iv), the focus of the court's

27   attention should be primarily on:

28

whether [employers] have complied with their obligations and whether discrimination has occurred, not [on] whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis.

29 C.F.R. § 1630.2(j)(2)(iii).

At the summary judgment stage, the Ninth Circuit does not require comparative or medical evidence to establish a genuine issue of material fact regarding the substantial limitation of a major life activity. *See Head v. Glacier N.W. Inc.*, 413 F.3d 1053, 1058 (9th Cir. 2005). "[A] plaintiff's testimony may suffice to establish a genuine issue of material fact." *Id.* Such testimony, however, must meet the generally required degree of personal knowledge and factual detail needed to withstand summary judgment. *See Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1063 (9th Cir. 2012.) "To survive summary judgment, an affidavit supporting the existence of a disability must not be merely self-serving and must contain sufficient detail to convey the existence of an impairment." *Head,* 413 F.3d at 1059.

## C.    The Evidence of Disability

Plaintiff's evidence that his leg injury substantially limited his ability to walk at the time of his termination includes his deposition testimony that, to manage his symptoms, he regularly uses a knee brace (PSOF ¶ 10-11), takes over the counter medications, and does a home exercise program. (PSOF ¶ 12.) Plaintiff testified that he regularly has pain, inflammation, drop foot, limited range of motion, numbness in his lower leg, and phantom nerve pains. (PSOF ¶ 13.) Plaintiff stated that he can only participate in activities that involve the use of his legs for a limited amount of time due to pain and swelling. (PSOF ¶ 14.) He limps, frequently trips over his toes, and almost fell down the stairs several times while working at VVAC. (PSOF ¶¶ 15, 17.) Plaintiff further testified that his biggest problems when he worked at VVAC were weakness and pain. He explained that he had to be careful about where he was stepping to avoid injuring himself. (PSOF ¶¶16, 18.) To support his claim of disability, Plaintiff also cites

Dr. Bingham's report that Plaintiff had "residual disability in his lower leg," including "numbness and weakness."[8]  (PSOF ¶¶ 27-28.)

In opposition, Defendant points to contradictory deposition testimony from Plaintiff's co-workers and Dr. Bingham stating that they did not observe Plaintiff limp. (Doc. 51 at 2, DCSOF ¶¶ 89, 120, 127, 188, 230.)[9]  Defendant also submits photographs of Plaintiff participating in various activities, including playing ping-pong, without a knee brace.  (Doc. 51 at 2; DCSOF, Ex. 18.)   Defendant also offers evidence that Plaintiff's co-workers observed him participating in various sports, working out, and running up and down stairs without a knee brace.  (Doc. 51 at 3; DCSOF ¶¶ 115, 116, 143-145, 178, 179, 198, 203, 218, 220, 240.)  In addition, Defendant points to Plaintiff's deposition testimony in which he described his disability as "pain and uncertainty as far as where I am stepping" that lasts "15 to 45 seconds" after getting up from resting, sitting, or driving for a long period of time.  (PSOF, Ex. 4 at 47-48.)

Defendant also notes that Dr. Bingham's report does not confirm Plaintiff's complaints of limping, drop foot, crepitus, hammer toe, limited range of motion, numbness, or phantom nerve pains.  (Doc. 51 at 3.)  However, because medical evidence is not required at the summary judgment stage to establish a genuine issue of material fact regarding the substantial limitation of a major life activity, any lack of medical

---

[8]  Plaintiff also cites to portions of Moore's deposition testimony stating that she assumed Plaintiff was disabled because he told her he was disabled.  (PSOF ¶ 34-35.) However, she stated that her conclusion was not based on her observation of his abilities, but instead she would accept Plaintiff's statement that he is disabled.  (PSOF ¶ 34.) Moore further stated that "But, basically, a disability is in your own power to say if you're disabled or not.  Some people have injuries, they don't want to say they're disabled.  So, what Matt has stated now that he's disabled, I assume that he is disabled." (PCSOF, Ex. 7 at 59.)  This testimony does not establish that Plaintiff was disabled; it establishes only that Moore was willing to accept Plaintiff's statement that he was disabled.

Similarly, Plaintiff cites Moore's and Muma's deposition testimony agreeing that weakness and numbness could impact Plaintiff's ability to walk and that the general public does not have numbness and weakness.  (PSOF ¶31-32.)  These statements do not establish that Plaintiff had weakness or numbness or that these conditions would substantially limit Plaintiff's or any other person's ability to walk.

[9]  Citations to "DCSOF" are the Defendant's Controverting Statement of Facts in Support of its Response to Plaintiff's Motion for Partial Summary Judgment.  (Doc. 50.)

evidence is not dispositve of the parties' motions.  *See Head*, 413 F.3d at 1058; 29 C.F.R. § 1630.2(j)(v).

### D.    Cases Applying the "Substantially Limits" Test

Plaintiff has offered evidence to raise a genuine issue of material fact regarding his leg injury and whether it caused him to suffer greater weakness and numbness when walking than most people in the community would experience.  *See* 29 C.F.R. § 1630.2(j)(v).   This conclusion is supported by recent case law analyzing "substantially limits" under the ADAAA.  In *Eastman v. Research Pharms., Inc.*, 2013 WL 3949236 (E.D. Pa. Aug. 1, 2013), the plaintiff offered evidence that because of sporadic "back pain," she "had significant difficulty moving, walking, sitting, and bending," even though she was also able to drive and "complete full work days."  *Id.* at *9.  The court found a genuine issue of fact as to disability:

> Although plaintiff may have been able to drive and work, plaintiff put forth evidence from which a fact finder could reasonably conclude that these activities were more difficult for her as compared to most people in the general population because they caused her significant pain.  Accordingly, under the less restrictive standard of the ADAAA, I conclude that Eastman has offered sufficient evidence to raise a genuine issue of fact as to whether she was disabled.

*Id.* at *10.

Similarly, in *Estate of Murray v. UHS of Fairmount, Inc.*, 2011 WL 5449364, at *7-8 (E.D. Pa. Nov. 10, 2011), the court found a genuine issue of material fact on the issue of disability, even though the sole evidence of substantial limitation was the plaintiff's testimony that because of her depression she experienced symptoms such as "[n]ot eating, not sleeping, having racing thoughts . . . [and] just feeling hopeless, helpless, sad."  *Id.* at *7; *see also Fleck v. WILMAC Corp.*, 2011 WL 1899198, at *4-5 (E.D. Pa. May 19, 2011) (finding allegations of an ankle injury that prevented the plaintiff from standing for more than one hour or walking more than a half-mile, even though she could work with the use of a cam boot, sufficient to establish disability under the ADAAA and withstand a motion to dismiss).

1      Furthermore, the cases Defendant cites are distinguishable and do not require the
2  entry of summary judgment in its favor.  In *Poper v. SCA Americas, Inc.*, 2012 WL
3  3288111 (E.D. Pa. Aug. 13, 2012), the court found that the plaintiff failed to establish
4  that he was disabled when the only evidence that his back problem substantially limited a
5  major life activity was the plaintiff's testimony that he experienced limitations brushing
6  his teeth, bending, and lifting over thirty pounds.  *Id.* at *8.  The court noted that the
7  plaintiff testified that he did not experience any limitations due to his back problem when
8  he was working for the defendant during the relevant time period.  *Id.*  Unlike *Poper*,
9  Plaintiff has offered testimony that he experienced limitations due to his leg injury when
10 he worked at VVAC.

11      In *Graham v. Three Vill. Cent. Sch.*, 2013 U.S. Dist. Lexis, 143264, at *35
12 (E.D.N.Y. Sept. 30, 2013), the plaintiff alleged disability based on a historic hip injury,
13 which the plaintiff claimed substantially limited the major life activities of walking,
14 standing, bending, and lifting.[10]  *Id.*  However, the plaintiff's deposition testimony
15 indicated that she was able to walk without difficulty, that she did not need any
16 accommodations, and "confirm[ed] that her alleged physical impairments did not
17 substantially limit the asserted major life activities . . . ."  *Id.* at 38-41.  In addition, the
18 court noted that when it compared the plaintiff's alleged condition to that of most
19 members of the general population, it was "difficult to decipher a distinguishable
20 limitation."  *Id.* at 41-42.  Unlike *Graham*, Plaintiff testified in his deposition that his leg
21 injury substantially limited his ability to walk.

22      **E.      Disputed Issues of Fact Preclude Summary Judgment on Disability**

23      Viewing the evidence in the light most favorable to Plaintiff, and construing that
24 evidence in favor of expansive coverage as required by the ADAAA, Plaintiff has raised
25 a genuine issue of material fact regarding whether his leg injury substantially limited his
26 ability to walk.  "At the summary judgment stage, the 'requisite degree of proof
27 necessary to establish a prima facie case . . . is minimal and does not even need to rise to

28
_____

[10]  A copy of this case is located at exhibit 3 to docket 51.

1    the level of a preponderance of the evidence.'"  *Lyons v. England*, 307 F.3d 1092, 1112

2    (9th Cir. 2002) (quoting *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)).

3    Therefore, the Court denies Defendant's motion for summary judgment on the issue of

4    disability for Plaintiff's discriminatory discharge and failure to accommodate claims

5    under the ADA and the Rehabilitation Act.

6             Plaintiff, however, has not established, *beyond* a dispute of material fact, that he is

7    disabled under the ADAAA.  *See McGregor v. Nat'l. R.R. Passenger Corp.*, 187 F.3d

8    1113, 1115 (9th Cir. 1999) (plaintiff must establish all prima facie elements of an ADA

9    claim beyond dispute of material fact to prevail on summary judgment).  Additionally,

10   the issue of whether an individual is substantially limited in a major life activity is

11   generally a question for the finder of fact.  *See Bristol v. Bd. of County Comm'rs of Clear*

12   *Creek*, 281 F.3d 1148 (10th Cir. 2002).  Accordingly, the Court also denies Plaintiff's

13   motion for partial summary judgment on the issue of disability.

14   **IV.    Causation under the ADA and Rehabilitation Act**

15           Defendant also moves for summary judgment on Plaintiff's claims of

16   discriminatory termination and retaliation under the ADA and Rehabilitation Act and

17   argues that Plaintiff cannot establish the causation element of these claims (Counts 2, 3, 5

18   and 6).  Defendant argues that even if there is an issue of fact on Plaintiff's alleged

19   disability, there is no evidence to establish that Plaintiff was terminated because of any

20   alleged disability.[11]  (Doc. 40 at 11; Doc. 51 at 6.)  Plaintiff argues that the temporal

21   proximity between when VVAC learned of his disability and when it terminated his

22   employment establishes a genuine dispute of fact on causation.  (Doc. 45 at 12.)

23

24

25

26   ─────────────────

27           [11]  Defendant's arguments assume that Plaintiff is a qualified individual with a
     disability, that he requested a reasonable accommodation, and that he was subject to an
     adverse employment action.  Defendant's summary judgment argument focuses only on
28   the causation element of Plaintiff's claims, which is whether Plaintiff was terminated
     *because* of his disability and request for accommodation.

### A.     Plaintiff's Prima Facie Case

To survive a summary judgment motion, a plaintiff must establish at least a genuine issue of material fact that he suffered an adverse employment action because of his disability.  To establish causation under the ADA:

> the plaintiff must show that the defendant had knowledge of [his] disability when making the adverse employment decision.  However, the plaintiff's disability need not be the sole reason for the defendant's actions.  Rather, liability attaches when the plaintiff's disability is a "motivating factor" in the defendant's adverse employment decision.

*Lucke v. Multnomah Cnty.*, 2008 WL 4372882, at *35 (D. Or. Sept. 22, 2008) (internal citations omitted); *see also Head*, 413 F.3d at 1065 ("Therefore, we hold that the ADA outlaws adverse employment decisions motivated, even in part, by animus based on a plaintiff's disability or request for an accommodation—a motivating factor standard."). Defendant asserts that the decision to terminate Plaintiff was made before he claimed a disability and, therefore, Plaintiff cannot establish causation on his ADA or Rehabilitation Act claims.  (Doc. 40 at 11; Doc. 51 at 6.)

The Seventh Circuit has held that an "employer cannot be held liable under the ADA for firing an employee when it indisputably had no knowledge of the disability." *Hedberg v. Indiana Bell Telephone Co., Inc.*, 47 F.3d 928, 932 (7th Cir. 1995).  In *Hedberg*, the decision to terminate the plaintiff was made during an October 12 department head meeting.  *Id.* at 930.  The plaintiff, however, was not told of that decision until November 16.  *Id.*  The defendant offered sworn affidavits that it did not know of the plaintiff's disability when it decided to discharge him.  *Id.* at 931.  The plaintiff did not try to controvert those affidavits by affidavit or other evidence.  *Id.*

Instead, the plaintiff argued that his direct supervisor must have told the department head about the plaintiff's illness before October 12 because that supervisor occasionally reported to the department head about the performance of his group members, including the plaintiff.  *Id.* at 931.  The court rejected that argument as speculative because the plaintiff had not offered any evidence to contradict the manager's

sworn statement that he did not tell the department head about the plaintiff's illness until November 11, and the plaintiff had requested that his manager not tell anyone he was sick. *Id.* at 932. Accordingly, the court found that the defendant did not know of the plaintiff's disability when it decided to discharge him, and that summary judgment was properly granted. *Id.*

Unlike *Hedberg*, the record before the Court does not clearly establish the date on which the termination decision was made. VVAC asserts that "shortly after" VVAC moved into its new building in May 2011, Moore found VVMS files on the Captains' computer and that these files were different from the files found on the computer in January 2011. (DSOF ¶ 23; PCSOF, Ex. 7 at 71, 122-28.)[12] Moore testified that she decided to terminate Plaintiff for "using the computers," but when she met with him on May 16, 2011, he told her that he had a disability and requested a first-floor bedroom. (PCSOF, Ex. 7 at 43-44, 57, 85; DSOF ¶ 26.) Moore stated that she decided to terminate Plaintiff before she found out about his alleged disability. (PCSOF, Ex. 7 at 44.)

However, Moore also testified that after she decided to terminate Plaintiff, she put him on administrative leave and conferred with Muma "about whether or not to terminate [Plaintiff]." (*Id.* at 93-94.) When asked when the "decision to terminate [Plaintiff] was actually made," Moore responded that "we did it on June 1st." (*Id.* at 90.) She later explained that it was during her meeting with Muma that she "actually decide[d] to terminate [Plaintiff]." (*Id.* at 94.) Moore stated that no documents were created verifying the date on which VVAC decided to terminate Plaintiff. (*Id.* at 95.)

Plaintiff advised VVAC of his alleged disability on May 16, 2011 and was terminated on June 1, 2011. Although Moore stated that she decided to terminate Plaintiff when she found VVMS documents on the Captains' computer in mid-May 2011, she also stated that she conferred with Muma about that decision and that they made the termination decision on June 1, 2011. Although some evidence in the record — Moore's

---

[12]   Citations to "PCSOF" are to Plaintiff's Controverting Statement of Facts located at docket 46 and 47. Exhibit 7 to PCSOF is the complete transcript of the July 13, 2013 deposition of Moore.

deposition testimony — suggests that Moore may have made a preliminary decision to terminate Plaintiff before he told her about his alleged disability, and before he requested assignment to a first-floor bedroom, that same evidence suggests that a final termination decision was not made until after VVAC knew of Plaintiff's alleged disability and after he had requested a first-floor bedroom.

Viewing the evidence in the light most favorable to Plaintiff, the timing of VVAC's termination decision is in dispute and a fact finder could reasonably conclude that the final termination decision was not made until after Plaintiff informed VVAC of his disability.  The Ninth Circuit has held that temporal proximity between an employer's knowledge of a protected activity (such as a request for accommodation) and an adverse employment action is sufficient evidence of causality to establish a prima facie case if the temporal proximity is very close.  *See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (holding that sufficient evidence of causation existed when adverse employment action occurred less than three months after the protected activity); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731-32 (9th Cir. 1986) (concluding that there was adequate evidence of a causal link when the retaliatory action occurred less than two months after the protected activity).

Here, Plaintiff disclosed his disability and requested an accommodation on May 16, 2011, and he was terminated two weeks later.  On summary judgment all inferences from the evidence must be construed in favor of the non-moving party and, therefore, the Court finds that Plaintiff has established a prima facie case of discrimination.  Although the evidence is not strong, Plaintiff has produced sufficient evidence to establish a genuine issue of material fact that he was terminated because of his disability.

### B.     Burden Shifting

Because Plaintiff has presented sufficient evidence to establish a prima facie case of discrimination, the Court applies the *McDonnell Douglas* burden-shifting analysis to his claims.[13]   *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 49-50 (2003) (applying

---

[13]  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

1    *McDonnell-Douglas* burden shifting framework to ADA disability discrimination claim).

2    Under this burden-shifting analysis, a plaintiff must first establish a prima facie disability

3    discrimination claim. *Id.* at 49 n.3. If a plaintiff establishes a prima facie case, the

4    burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its

5    employment action. *Id.* If the employer proffers such a reason, "the presumption of

6    intentional discrimination disappears," but the plaintiff can still prove discrimination by

7    offering evidence demonstrating that the employer's explanation for the adverse action

8    was a pretext. *Raytheon*, 540 U.S. at 49 n.3; *see also Brooks*, 229 F.3d at 928.

9        **C.**    **Legitimate Non-Discriminatory Reasons**

10        VVAC argues that, even if Plaintiff establishes a prima facie case of

11    discriminatory discharge, it had legitimate non-discriminatory reasons for terminating

12    Plaintiff because of "a repeat finding of Plaintiff's medical marijuana business materials

13    on VVAC's computers, his prior disciplinary history, and ultimately, the dissension he

14    was causing among VVAC employees based on his threats to sue VVAC." (Doc. 40 at

15    11.) VVAC's proffered reasons for terminating Plaintiff are sufficient to at least create a

16    genuine issue of material fact that it had legitimate non-discriminatory reasons for

17    Plaintiff's termination. *See Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133,

18    142 (2000) ("Th[e] burden [of showing a legitimate and non-discriminatory reason for an

19    adverse employment action] one of production, not persuasion; it 'can involve no

20    credibility assessment.'") (citation omitted). Thus, the burden shifts to Plaintiff to show

21    evidence of prextext. *See Collings v. Longview Fibre Co*., 63 F.3d 828, 833 (9th Cir.

22    1995) ("Unless [the plaintiff] can show that [the defendant's] explanation for [the

23    plaintiff's] discharge was a pretext for disability discrimination, . . . [he has] presented no

24    triable issue under the ADA.").

25        **D.**    **Pretext**

26        To establish pretext, a plaintiff must present evidence beyond that required to state

27    a prima facie case, but the evidence may be either direct or indirect. *Godwin v. Hunt*

28    *Wesson, Inc*., 150 F.3d 1217, 1220 (9th Cir. 1998). "[T]he plaintiff may establish pretext

1  'either directly by persuading the court that a discriminatory reason more likely
2  motivated the employer or indirectly by showing that the employer's proffered
3  explanation is unworthy of credence.'"  *Id.* (quoting *Texas Dept. of Cmty. Affairs* v.
4  *Burdine*, 450 U.S. 248, 256 (1981)).  When the plaintiff presents direct evidence of
5  pretext, the evidentiary requirement is minimal; when the plaintiff presents indirect
6  evidence, it must be specific and substantial.  *Godwin,* 15 F.3d at 1222.

7       Plaintiff argues that there are genuine issues of material fact regarding whether
8  VVAC's proffered reasons for his termination are pretext because VVAC terminated him
9  approximately two weeks after learning of his disability, has offered inconsistent
10 explanations for terminating Plaintiff, its termination of Plaintiff is inconsistent with its
11 past practices for terminating employees, and its claims that it found new VVMS
12 documents on the Captains' computer are not credible.  (Doc. 45 at 12.)  The Court
13 addresses each of these arguments below.

14                **1.       Temporal Proximity**

15      After Plaintiff informed VVAC of his alleged disability and requested assignment
16 to a first-floor bedroom on May 16, 2011, he was placed on administrative leave and was
17 terminated two weeks later.  (PCSOF ¶¶ 103-04, 129, 142.)  While the timing of VVAC's
18 employment decision is part of Plaintiff's prima facie case, the Court may consider the
19 proximity of events in its analysis of both the prima facie case and pretext.  *See Little v*
20 *Windermere Relocation, Inc*., 301 F.3d 958, 971 (9th Cir. 2001) (proximity of timing
21 between when an employee reported a rape and when she was terminated created a
22 question of fact regarding employer's motives).  The temporal proximity and Plaintiff's
23 other evidence, as discussed below, is sufficient to create a genuine issue of material fact
24 on the issue of pretext.  Although "[a] prima facie case is insufficient to preclude
25 summary judgment, a plaintiff need produce 'very little evidence of discriminatory
26 motive to raise a genuine issue of fact' as to pretext."  *Id.* (citing *Strother v. S. Cal.*
27 *Permanente Med. Group*, 79 F.3d 859, 870 (9th Cir. 1996)).

28

## 2.    Inconsistent Explanations

In addition to the timing issues, Plaintiff has presented evidence that VVAC offered different reasons for terminating him in its termination letter and in its position statement to the EEOC.  This evidence is sufficient to raise an issue of material fact regarding pretext.  In its position statement filed with the EEOC (PCSOF Ex. 13), VVAC claimed that it terminated Plaintiff based on his prior disciplinary history, a repeat finding of VVMS materials on a VVAC computer, and the dissension he was causing among VVAC employees.[14]  However, the termination letter that VVAC gave Plaintiff in June 2011 did not include a specific reason for his termination, other than stating that VVAC was an "at-will employer," and Moore would not give Plaintiff a reason aside from stating that he was an at-will employee.[15]  (PCSOF ¶¶ 130-38, 140-41; PCSOF, Ex. 7 at 47; PCSOF, Ex. 15.)  Additionally, Moore stated during her deposition that termination letters in 2011 and 2012 for other VVAC employees included specific reasons for the termination of those employees.[16]  (PCSOF, Ex. 7 at 86-87; PCSOF, Exs. 19, 20.)

---

[14]  Plaintiff argues that VVAC gave inconsistent reasons for his termination in its position statement with the EEOC and in its motion for summary judgment.  (Doc. 45 at 14 n. 4.)  The Court agrees that VVAC sometimes emphasized that it did not condone an employee participating in a medical marijuana business, and sometimes emphasized that Plaintiff's use of VVAC's computers for personal use violated its policies.  However, because VVAC consistently asserted that Plaintiff's personal use of VVAC computers in relation to his medical marijuana business was a basis for his termination, the Court finds that Plaintiff's violation of VVAC's computer usage policies and Plaintiff's continued involvement in a medical marijuana business are not contradictory reasons for Plaintiff's termination.

[15]  The June 1, 2011 termination letter, signed by Moore, states in pertinent part, that VVAC is an "'at-will' employer and retains the right to end any employment relationship with any employee at any time, with or without cause, and with or without reasons."  (PCSOF, Ex.15.)  The letter then states that, "[t]herefore, effective today, June 1, 2011, your employment relationship with [VVAC] has been terminated."  (Id.)

[16]  In an August 23, 2011 letter, Moore terminated a VVAC employee for being "unreasonable, rude, undermining a Doctor's orders, and placing the family [of a patient] in an uncomfortable situation . . . ."  (PCSOF, Ex. 19.)  The letter specifically identified the VVAC policy that the employee had violated, noted that she had broken "the conduct work rules" several times, noted that it seemed to be a continuing problem, and indicated that the Verde Valley Medical Center was filing a formal complaint stating that it had a continuing problem with that employee when she picked up patients from its facility.  (Id.)

- 18 -

Inconsistences, contradictions, or shifting explanations for terminating an employee tend to show that an employer's proffered reason for terminating that employee is pretext.  *See Payne v. Norwest Corp*., 113 F.3d 1079, 1080 (9th Cir. 1997) (holding that the shifting explanation creates a material issue of fact because a "rational trier of fact could find that the[ ] varying reasons show that the stated reason was pretextual").  Considering evidence that Moore provided specific reasons for terminating other employees around the same time as Plaintiff's termination, and the variation between Plaintiff's termination letter and the more specific reasons provided in VVAC's EEOC position statement, the Court finds that there is a genuine issue of material fact regarding whether VVAC's proffered reasons for terminating Plaintiff are pretext.

### 3.    Inappropriate Computer Use

Plaintiff also argues that VVAC's assertion that it terminated him based on its discovery of "new" VVMS documents on a VVAC computer in May 2011 is evidence of pretext because Moore's testimony is not credible evidence.  (Doc. 45 at 4, 13.)  Plaintiff asserts that after Moore and Muma reprimanded him in January 2011 for having VVMS documents on the Captains' computer, he tried to delete all of those documents from the computer.  (Doc. 45 at 14; PCSOF ¶¶ 113-14.)  He asserts that if Moore found VVMS documents on the Captains' computer in May 2011, they are the same documents that Moore had in digital format in January 2011 and, therefore, her assertion that she terminated him based on her discovery of new VVMS documents is a pretext for discrimination.  (Doc. 45 at 11-12; PCSOF ¶ 117; PCSOF, Ex. 4 at 104-08.)

Moore testified in her deposition that she wrote "taken off Captains' computers May 2011" on the documents that an IT employee removed from the computer in May 2011.  (PCSOF, Ex. 7 at 122-23.)  VVAC moved to a new building on May 12, 2011.  (*Id.* at 123.)  She testified that the documents were removed from the computer on May

---

In an April 19, 2012 letter, Moore explained that she terminated a VVAC employee for being dishonest and not showing up for work in violation of two specific VVAC policies.  (PCSOF, Ex. 20.)

15, 2011.  (*Id.* at 123.)  She explained that the documents were found on the Captains' computer when the computers were set up in the new building.  (*Id.* at 124-26, 128.) Moore also testified that the documents removed from the Captains' computer in May 2011 were not the same documents discovered on the computer in January 2011. (PCSOF, Ex. 7 at 71, 126.)

Plaintiff argues that there is no evidence, besides Moore's testimony, to establish that VVMS documents were discovered on the Captains' computer in May 2011. (Doc. 45 at 4.)  Plaintiff argues that Moore's testimony is not credible because she could not recall whether the documents were located on an "old" computer at the old building or a "new" computer at the new building, (*Id.* at 123-24), she could not determine when the documents were last modified (*Id.* at 125), when they were placed on the computer (*Id.*), and she did not record the specific date in May 2011 the documents were removed from the computer and instead wrote only "May 2011."  (*Id.* at 127-28.)

Thus, Plaintiff offers indirect evidence of pretext by arguing "that [VVAC's] proffered explanation is unworthy of credence."  *See Godwin*, 150 F.3d at 1220. Plaintiff, however, "need produce 'very little evidence of discriminatory motive to raise a genuine issue of fact' as to pretext."  *See Little*, 301 F.3d at 971.  Applying this minimal standard on summary judgment, the Court finds that Plaintiff's challenges to Moore's testimony raise disputed issues of fact regarding whether Moore discovered VVMS documents on the Captains' computer in May 2011.

Plaintiff also argues that the VVMS documents Moore alleges she found on the Captains' computer in May 2011 are the same as the documents discovered in January 2011.  (Doc. 45 at 14.)  Plaintiff's testimony that the documents allegedly discovered in May 2011 were the same as the documents discovered in January 2011 (PCSOF, Ex. 4 at 104-07),[17] conflicts with Moore's testimony that the documents were different.  (PCSOF, Ex. 7 at 71, 126.)  This conflict in the testimony is sufficient to raise an issue of fact regarding whether the VVMS documents that Moore asserts she found on the Captains'

---

[17] Exhibit 4 to PCSOF is the transcript of Plaintiff's January 21, 2014 deposition.

1  computer in May 2011 were different from the VVMS documents that she found on the
2  Captains' computer in January 2011.

3        Defendant asserts that "[w]hen the files were placed on the computer and/or when
4  they were last modified is irrelevant.  Plaintiff's business files were not supposed to be on
5  the computer."  (Doc. 51 at 9.)  Thus, it appears Defendant is arguing that whether the
6  VVMS documents that Moore claims she discovered in May 2011 were different from
7  the documents she discovered in January 2011 is irrelevant to the issue of pretext.
8  However, a fact finder could determine that the documents were the same and then
9  conclude that Moore's stated reason for terminating Plaintiff — because she found new
10  VVMS documents on the Captains' computer in May 2011 — was a pretext.  Therefore,
11  the Court finds that there are disputed issues of fact regarding pretext and denies
12  Defendant's motion for summary judgment on discriminatory discharge.

13        **E.      Causation for Retaliation Claims**

14        Plaintiff also alleges that VVAC terminated him in retaliation for his request for a
15  reasonable accommodation, an assignment to a first-floor bedroom.  (Doc. 1 at 7.)  As set
16  forth above, Defendant argues that it decided to terminate Plaintiff's employment before
17  he asserted that he had a disability and requested a first-floor bedroom as an
18  accommodation.  Therefore, Defendant argues that Plaintiff cannot establish causation for
19  his retaliation claims under the ADA and the Rehabilitation Act, and the Court should
20  enter summary judgment in Defendant's favor on these claims.

21        A prima facie case of retaliation under the ADA requires a plaintiff to show:
22  "(1) involvement in a protected activity, (2) an adverse employment action, and (3) a
23  causal link between the two."  *Brown v. City of Tucson*, 336 F.3d 1181, 1187 (9th Cir.
24  2003) (citation and internal quotation marks omitted).  The plaintiff must present
25  "evidence adequate to create an inference that an employment decision was based on an
26  illegal discriminatory criterion."  *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S.
27  308, 312 (1996) (emphasis modified) (citation and internal punctuation omitted).  In other
28  words, Plaintiff must establish a link between his request for a reasonable

accommodation and his termination.  *See Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).

Plaintiff was engaged in a protected activity when he requested that VVAC make reasonable accommodation for his alleged disability and he suffered an adverse employment action when he was terminated.  Plaintiff requested assignment to a first-floor bedroom for his alleged disability around May 16, 2011.  He was placed on administrative leave around May 18, 2011, and was terminated on June 1, 2011.  (PCSOF ¶ 129.)  The Court has already concluded that there are genuine issues of material fact regarding the timing of Defendant's decision to terminate Plaintiff.  Furthermore, the closeness in time between Plaintiff's engagement in the protected activity and the adverse employment action is "strong circumstantial evidence of retaliation," *Bell v. Clackamas County*, 341 F.3d 858, 865-66 (9th Cir. 2003), and "is sufficient to establish a genuine issue of material fact as to whether a causal link exists."  *Arn v. News Media*, 175 Fed. App'x 844, 846 (9th Cir. 2006) (citing *Thomas v. City of Beaverton*, 379 F.3d 802, 812 (9th Cir. 2004)).  Therefore, viewing the evidence in the light most favorable to Plaintiff, the factual issues and inferences related to the timing of Plaintiff's termination are sufficient to defeat Defendant's motion for summary judgment on Plaintiff's retaliation claims.

## V.      Plaintiff's GINA Claim

### A.      Plaintiff's Examination at Verde Valley Urgent Care

On May 30, 2011, Moore sent Plaintiff to Scott D. Bingham, D.O., at Verde Valley Urgent Care to determine whether Plaintiff was qualified to engage in his work duties.  (PSOF ¶ 21; DSOF ¶ 27.)  As part of that examination, Plaintiff completed a "Health and Occupational History and Physical Exam."  (PSOF, Ex. 8.)  The form included a table labeled "family history," that listed various diseases with a place for the patient to indicate "yes" or "no" for each disease, and then a place to indicate the affected

1    family member.  (*Id.*)  On the line listing "cancer," Plaintiff placed a check mark in the
2    "yes" column and then wrote "grandpa."[18]  (*Id.*)

3    Dr. Bingham testified in his deposition that the "Health and Occupational History
4    and Physical Exam" form, which included information about family history, "would
5    never have been made available to employers" and instead would have stayed with his
6    clinic.  (DCSOF, Ex. 8 at 25)  He further testified that the only information sent to an
7    employer after a "fitness-to-work" exam would be a letter stating whether the employee
8    could perform job duties.[19]  (*Id.*)  Moore states that after Plaintiff filed a charge of
9    discrimination with the EEOC, she contacted Verde Valley Urgent Care and requested a
10   copy of Dr. Bingham's June 1, 2011 letter.  (DCSOF, Ex. 6 at ¶12.)  In response, she
11   received documentation that included Plaintiff's family history, which she had not
12   requested or expected, and which Verde Valley Urgent Care had never previously
13   provided for any VVAC employees.  (*Id.* at ¶¶ 11-13.)

14   Plaintiff alleges that VVAC violated GINA by requiring him to disclose "genetic
15   information" in his family medical history during his examination at Verde Valley Urgent
16   Care.  (Doc. 1 at 9-10.)  Plaintiff asserts that the required disclosure of such information
17   was "part of Verde Valley Urgent Care's practice at the time."  (PSOF ¶¶ 43-44, 52.)  In
18   response, VVAC argues that it did not violate GINA because, without its knowledge or
19   instruction, Dr. Bingham used a standard form to obtain Plaintiff's family medical history
20   and "inadvertently" provided that information to VVAC after Plaintiff's termination.
21   (Doc. 40 at 15.)  It also argues that Dr. Bingham and Verde Valley Urgent Care were
22   independent contractors and not employees of VVAC, and were not "employers" under

---

23

24   [18]  Plaintiff has filed a copy of the "Health and Occupational History and Physical
25   Exam."  (PSOF, Ex. 8.)  Although he has redacted certain information, such as his name,
     address, social security number, and phone numbers, he did not seek permission to file
26   the form under seal or otherwise prevent the public disclosure of this information.

27   [19]  The June 1, 2011 letter Dr. Bingham sent to VVAC regarding Plaintiff's
28   examination was Exhibit 6 to his deposition.  (PSOF, Ex. 9; DCSOF, Ex. 20.)  That letter
     does not include any information that could be considered genetic information or family
     history.

1    GINA.  (Doc. 49 at 14.)  Both parties have moved for summary judgment on Plaintiff's

2    GINA claim (Count 7).  (Docs. 37 at 16; Doc. 40 at 14)

3        **B.    Acquiring "Genetic Information" under GINA**

4        Under GINA, it is unlawful for an employer to discriminate against an employee

5    on the basis of genetic information, to use genetic information in making employment

6    decisions, or to "request, require, or purchase" genetic information from an employee.  42

7    U.S.C. § 2000ff-1(a)  and  (b).    VVAC  asserts  that  there  is  no  evidence  that  it

8    discriminated against Plaintiff because of genetic information or that is used genetic

9    information in making employment decisions.  (Doc. 49 at 14.)  Plaintiff does not allege

10   that VVAC violated GINA in this manner.[20]  (*See* Doc. 1.)

11       Instead, it appears that Plaintiff is alleging that VVAC violated GINA by

12   requesting, requiring, or purchasing genetic information.  *See* 42 U.S.C. § 2000ff-1(b)

13   ("It shall be an unlawful employment practice for an employer to request, require, or

14   purchase genetic information with respect to an employee of family member of the

15   employee.")  The EEOC regulations interpreting GINA refer to requesting, requiring, or

16   purchasing genetic information as "acquisition" of genetic information, which includes

17   an employer "making requests for information about an individual's current health status

18   in a way that is likely to result in a covered entity obtaining genetic information."  29

19   C.F.R. § 1635.8(a).

20       The regulations also provide that "the general prohibition against requesting,

21   requiring, or purchasing genetic information does not apply: . . . [w]here a covered entity

22   inadvertently requests or requires genetic information of the individual or family member

23   of the individual."  29 C.F.R. § 1635.9(b)(1).  However, the acquisition of genetic

24   information "will not generally be considered inadvertent" unless the covered entity

---

[20] To state a claim for genetic discrimination under GINA, a plaintiff must allege: (1) that he was an employee, (2) who was discharged or deprived of employment opportunities, (3) because of information from his genetic tests.  *Allen v. Verizon Wireless,* 2013 WL 2467923, at *23 (D. Conn. June 6, 2013).  Because it is undisputed that VVAC did not receive Plaintiff's family medical history until after his termination, Plaintiff cannot establish causation and any claim for discrimination under GINA would fail.

1    directed the health care provider not to provide genetic information.   29 C.F.R.
2    § 1635.8(b)(1)(i)(A).   The regulations further explain that the failure to provide this
3    direction:

4              will not prevent [the covered entity] from establishing that a
               particular receipt of genetic information was inadvertent if its
5              request for medical information was not 'likely to result in a
               covered entity obtaining genetic information' (for example,
6              where an overly broad response is received in response to a
               tailored request for medical information.)
7

8    29 C.F.R. § 1635.8(b)(1)(i)(C).

9         In response to Plaintiff's motion for summary judgment, and in its motion for
10   summary judgment, VVAC argues that its acquisition of any genetic information was
11   "inadvertent" and, therefore, it has no liability under GINA.   (Doc. 49 at 15; Doc. 40 at
12   15.)  Although VVAC cites the regulations addressing inadvertent acquisition, it does not
13   explain how these regulations apply to its acquisition of information from Verde Valley
14   Urgent Care.  (Doc. 49 at 15.)   Similarly, Plaintiff cites these regulations, but does not
15   acknowledge that the regulations exclude the inadvertent acquisition of genetic
16   information, and excuse the requirement for a covered entity to direct a health care
17   provider not to provide genetic information if the covered entity's request for information
18   was not likely to result in obtaining genetic information, such as when there was a
19   narrowly tailored request for information.  (Doc. 52 at 10.)

20        Instead, Plaintiff argues that VVAC violated GINA by failing to direct Verde
21   Valley Urgent Care "not to disclose any such genetic information" to VVAC.  (Doc. 37 at
22   17; Doc. 52 at 10.)   To support this claim, Plaintiff cites 29 C.F.R. § 1635.8(d), which
23   provides that the "prohibition on acquisition of genetic information, including family
24   medical history, applies to medical examinations related to employment."   That section
25   further provides that

26             [a] covered entity **must tell health care providers not to
               collect genetic information**, including family medical
27             history, as part of a medical examination intended to
               determine the ability to perform a job, and **must take
28             additional reasonable measures within its control if it
               learns that genetic information is being requested or**

**required**.  Such reasonable measures may depend on the facts and circumstances under which a request for genetic information was made, and may include no longer using the services of a health care professional who continues to request or require genetic information during medical examinations after being informed not to do so.

*Id*. (emphasis added).

Although Plaintiff cites the applicable regulation, C.F.R. § 1635.8(d), he does not discuss the elements of a GINA claim based on a violation of that regulation, does not cite any authority, aside from the regulation, to support his claim that VVAC violated that regulation by failing to direct Verde Valley Urgent Care not to disclose Plaintiff's genetic information to it, and does not specifically explain the relief he seeks for the alleged violation of that regulation.  (Doc. 1 at 10-11, Doc. 37 at 17.)

In sum, Plaintiff's summary judgment briefing does not include any substantive discussion supporting entitlement to summary judgment based on VVAC's alleged violation of 29 C.F.R. § 1356.8(d).  *See Sanchez v. Miller*, 792 F.2d 694, 703 (7th Cir. 1986) ("It is not the obligation of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel."); *Marco Realini v. Contship Containerlines, Ltd*., 143 F. Supp. 2d 1337, 1343 (S.D. Fla. 1999) (denying summary judgment when parties had failed to adequately brief the issues).

Accordingly, the Court denies Plaintiff's motion for summary judgment on his claim that VVAC violated GINA by failing to instruct "Bingham not to provide [Plaintiff's] genetic information," (Doc. 52 at 10), as required by C.F.R. § 1635.8(d).  *See Healix Infusion Therapy, Inc. v. Helix Health LLC*, 737 F. Supp. 2d 648, 658 (S.D. Tex. 2010) (denying the plaintiff's motion for summary judgment for failure to include any substantive discussion or proof supporting entitlement to a permanent injunction or specific performance).

Similarly, the Court denies VVAC's motion for summary judgment because it has failed to show that it is entitled to judgment as a matter of law on this claim.  *See Sanchez*, 792 F.2d at 703; *Marco Realini*, 143 F. Supp. 2d at 1343.  VVAC makes a

conclusory argument that the requirements contained in C.F.R. § 1635.8(d) exceeded the EEOC's rule-making authority, but does not provide any analysis of relevant legal authority to support that assertion or to support its claim that it is entitled to summary judgment on that basis.  (Doc. 49 at 15.)

### C.     GINA's Definition of "Genetic Information"

In their motions, the parties do not address whether the information that VVAC received from Verde Valley Urgent Care is "genetic information," as defined in GINA. The information at issue is Plaintiff's notation on his family medical history that a "grandpa" had "cancer."  There is no other family medical information included in the "Health and Occupational History and Physical Exam" form that Plaintiff completed for the Verde Valley Urgent Care examination.

"Genetic information" is defined under GINA as information about (1) an individual's genetic tests; (2) the genetic tests of family members of an individual; or (3) the manifestation of a disease or disorder in family members of an individual.  42 U.S.C. § 2000ff(4).   The regulations issued by the EEOC clarify that the phrase "manifestation of a disease or disorder in family members" refers to an employee's "family medical history," interpreted in accordance with its normal understanding as used by medical providers.  29 C.F.R. §1635.3(c)(iii).

GINA is intended to prohibit employers from making a "predictive assessment concerning an individual's propensity to get an inheritable genetic disease or disorder based on the occurrence of an inheritable disease or disorder in [a] family member." *Poore v. Peterbilt of Bristol, LLC*, 852 F. Supp. 2d 727, 730 (W.D. Va. 2012) (quoting H.R.Rep. No. 110-28, pt. 3, at 70 (2007), 2008 U.S.C.C.A.N. 112, 141).  Family medical history was included in the definition of "genetic information" because Congress understood that employers could potentially use family medical history as a "surrogate for genetic traits."  *Poore,* 852 F. Supp. 2d at 730 (quoting H.R.Rep. No. 110-28, pt. 1, at 36 (2007), 2008 U.S.C.C.A.N. 66, 80).  However, "the fact that an individual family member has been diagnosed with a disease or disorder is not considered 'genetic

information' if 'such information is taken into account only with respect to the individual in which such disease or disorder occurs and not as genetic information with respect to any other individual." *Poore*, 852 F. Supp. 2d at 731 (quoting H.R.Rep. No. 110-28, pt. 2, at 27 (2007), 2008 U.S.C.C.A.N. 101, 105; Regulations Under the Genetic Information Nondiscrimination Act of 2008, 75 Fed. Reg. 68,917 (Nov. 9, 2010)).

Here, although the "Health and Occupational History and Physical Exam" form requested family medical history, there is nothing in the record that suggests that this information was "taken into account" with respect to Plaintiff.  Plaintiff alleged disability based on an injury, not a "manifestation of a disease or disorder," and Dr. Bingham's contemporaneous notes state that Plaintiff's family history is "unremarkable."  (PSOF ¶ 25, DCSOF, Ex. 9.)  Plaintiff does not argue that any information from his family medical history was considered or used in any manner as part of his examination or for any employment decision.  Instead, he simply argues for strict liability any time an employer receives information about an employee's family medical history.  Because the parties have not addressed this issue, and because it appears from the record that there is a genuine issue of fact whether the information VVAC received from Verde Valley Urgent Care is "genetic information," the Court denies both motions for summary judgment on Plaintiff's GINA claims.

### D.    Definition of an Employer under GINA

Finally, Plaintiff alleges that VVAC was an employer under GINA and that it violated GINA by requiring Plaintiff to disclose family medical history pursuant to its "policy or practice regarding medical examinations" that required employees to disclose family history.  (Doc. 1 at 10.)  In its motion for summary judgment, VVAC asserts that it did not request Dr. Bingham to collect Plaintiff's genetic information and that Verde Valley Urgent Care is an independent contractor and not an employer under GINA. (Doc. 40 at 14-15.)   GINA defines an employer as a person employing a sufficient number of employees, and "any agent of such a person."  42 U.S.C. § 2000ff(2)(B)(i)

1  (adopting the definition of employer in Title VII, 42 U.S.C. § 2000e(b)); 42

2  U.S.C. § 2000e(b)

3       In his reply in support of his motion for summary judgment, Plaintiff, for the first

4  time, asserts that VVAC is liable for a GINA violation under an agency theory.

5  Specifically, Plaintiff argues that Verde Valley Urgent Care was an agent of VVAC and,

6  therefore, an employer under GINA.  (Doc. 52 at 11.)  In support of that argument,

7  Plaintiff asserts that Verde Valley Urgent Care was VVAC's agent because "Verde

8  Valley Urgent Care performed fit-to-work physicals on [VVAC] employees — during

9  which it requested family medical history — and then advised [VVAC] if employees

10  could perform the essential functions of their job."  (Doc. 52 at 11; PSOF 20, 42-46.)

11       Plaintiff, however, does not address the elements of his GINA claim, and does not

12  cite any authority addressing the definition of "agent" as used in § 2000e(b), and

13  incorporated in GINA.  In short, Plaintiff's summary judgment briefing fails to include

14  any substantive discussion supporting entitlement to relief based on a GINA violation

15  premised on its theory that Verde Valley Urgent Care was VVAC's agent.  As the

16  moving party, Plaintiff "bears the initial responsibility of informing the district court of

17  the basis for [his] motion, and identifying those portions of the [record, including

18  pleadings, discovery materials and affidavits], which it believes demonstrate the absence

19  of a genuine [dispute] of material fact."  *Celotex Corp*., 477 U.S. at 323.  Because

20  Plaintiff has not met his initial burden, the Court denies Plaintiff's motion for summary

21  judgment on his claim that VVAC is liable for Verde Valley Urgent Care's acquisition of

22  Plaintiff's genetic information because Verde Valley Urgent Care was its agent.  *See*

23  *Sanchez*, 792 F.2d at 703; *Marco Realini*, 143 F. Supp. 2d at 1343.

24       The Court also denies VVAC's motion for summary judgment on the GINA claim

25  based on its assertion that a "private physician" is not an employer under GINA.

26  (Doc. 40 at 15.)  Although VVAC asserts that GINA does not apply because it did not

27  request genetic information, and because Verde Valley Urgent Care or Dr. Bingham are

28  not employers under GINA, it does not address GINA's definition of an employer, which

1   includes an employer's agent, does not address the elements to establish a claim under

2   GINA, or explain why it is entitled judgment as a matter of law on Plaintiff's GINA

3   claim.  *See Sanchez,* 792 F.2d at 703; *Marco Realini*, 143 F. Supp. 2d at 1343.

4        Accordingly, the Court denies both Plaintiff's and Defendant's motions for

5   summary judgment on Plaintiff's GINA claims.

6   **VI.   Punitive Damages**

7        The complaint generally seeks "punitive damages," without specifying on which

8   counts of the complaint Plaintiff seeks such damages or citing any particular statute in

9   support of that request.   (Doc. 1 at 10.)   Defendant requests summary judgment on

10  Plaintiff's claim for punitive damages.   (Doc. 40 at 16.)   Defendant states that punitive

11  damages are recoverable under the ADA, the Rehabilitation Act, and GINA, and that

12  those damages are governed by 42 U.S.C. § 1981a(b).   (Doc. 40 at 16.)   The statute

13  allows for punitive damages in cases in which the defendant has engaged in

14  discriminatory acts "with malice or with reckless indifference" to the rights of the

15  plaintiff.  42 U.S.C. § 1981a(b)(1).  Defendant argues that Plaintiff has not presented any

16  evidence of malice or reckless indifference.  (Doc. 40 at 16 (citing *Kolstad v. Amer.*

17  *Dental Ass'n.,* 527 U.S. 526).)

18       In *Kolstad*, the Supreme Court explained that in § 1981a "Congress plainly sought

19  to impose two standards of liability — one for establishing a right to compensatory

20  damages and another, higher standard that a plaintiff must satisfy to qualify for an award

21  of punitive damages."   527 U.S. at 534.   Thus, for an award of punitive damages, an

22  "employer must act with 'malice or reckless indifference to the *[plaintiff's] federally*

23  *protected rights*.'"  *Id.* at 535 (quoting 42 U.S.C. § 1981a(b)(1)) (alteration and emphasis

24  in original).   The Court further explained that the terms "malice" and "reckless

25  indifference" pertain to "the employer's knowledge that it may be acting in violation of

26  federal law, not its awareness that it is engaging in discrimination."   *Id.* at 535.

27  Therefore, under this standard, "an employer must at least discriminate in the face of a

28

1   perceived risk that its actions will violate federal law to be liable in punitive damages."

2   *Id.* at 536.

3       Plaintiff does not dispute that to support his claim for punitive damages he must

4   establish that Defendant acted with "malice or reckless indifference" to his rights.[21]

5   (Doc. 45 at 17.)  Indeed, Plaintiff cites cases applying this standard from *Kolstad*.  (*Id.*)

6   Instead, Plaintiff argues that punitive damages are appropriate because Moore "had

7   attended more training than any other employee at Verde Valley and that Moore had

8   provided ADA training to other Verde Valley employees."[22]  (*Id.*)

9       To support this assertion, Plaintiff cites Moore's deposition testimony in which

10  she states that she attended seminars at which the ADA was discussed (PCSOF, Ex. 7 at

11  15-16), and that she provided some training to other VVAC employees by "talking with

12  them" and directing them to resources on a website.  (*Id.* at 21.)  She also testified that

13  she learned "most of [her] stuff about the [ADA]" at an EMS management training

14  course at which they discussed the ADA for "a half an hour to an hour."  (*Id.* at 16 -17.)

15  She also testified that she did not know of the ADAAA (*Id.* at 18) or the Rehabilitation

16  Act.  (*Id.* at 22)

17      Moore's testimony that she had received some training on the ADA and that she

18  provided some ADA training to other VVAC employees may show that she "knew of or

19  [was] familiar with antidiscrimination laws," *EEOC v. Autozone, Inc.,* 707 F.3d 824, 835

20  _____

21      [21]  Plaintiff argues that punitive damages are available because Defendant
        "intentionally discriminated" against him. (Doc. 45 at 14.)  Although the damages statute
22      provides that compensatory and punitive damages are available only in cases of
        intentional discrimination, which excludes disparate impact cases, it also provides that
        punitive damages require a showing of malice or reckless indifference.   42 U.S.C.
23      § 1981a(a)(2) and (b)(1); *see also Kolstad,* 527 U.S. at 534 (explaining that the statute
        limits compensatory and punitive damages "to cases of 'intentional discrimination' —
24      that is, cases that do not rely on the 'disparate impact' theory of discrimination.")  Thus,
        intentional discrimination, without malice or reckless indifference to the plaintiff's rights,
25      is not enough to allow punitive damages.  *See Kolstad,* 527 U.S. at 534 (explaining that
        Congress intended to authorize punitive damages "only in a subset of cases involving
26      intentional discrimination," and § 1981a "requires plaintiffs to make an additional
        'demonstrat[ion]' of their eligibility for punitive damages.") (alteration in original).
27
        [22]  To support this statement, Plaintiff cites PCSOF ¶ 177.   However, his
28  controverting statement of facts ends at paragraph 177 and from context it appears that
    plaintiff intended to cite PCSOF ¶ 171.

1  (7th Cir. 2012), but it does not establish that when she terminated Plaintiff she acted "in

2  the face of a perceived risk that [her] actions [would] violate federal law." *See Koldstad*,

3  527 U.S. at 536.  Plaintiff does not argue that any other evidence supports his claim for

4  punitive damages.[23]

5  This evidence is not sufficient to establish that Defendant acted with "malice" or

6  "reckless indifference" to Plaintiff's rights.[24]  If accepted, Plaintiff's argument that

7  knowledge of antidiscrimination laws is sufficient to establish a claim for punitive

8  damages "would reduce the incentive for employers to implement antidiscrimination

9  programs. . . . [and would] likely exacerbate concerns among employers that § 1981a's

10  'malice' and 'reckless indifference' standard penalizes those employers who educate

11  themselves and their employees on [antidiscrimination law]." *Kolstad*, 527 U.S. at 544

12  (discussing an employer's vicarious liability for punitive damages).  As the Court

13  explained, "[d]issuading employers from implementing programs or policies to prevent

14  discrimination in the workplace is directly contrary to the purposes underlying Title VII.

15  The statute's 'primary objective' is 'a prophylactic one,' it aims, chiefly, 'not to provide

16

17  [23]  Plaintiff cites PCSOF ¶¶ 103-55, but does not provide any argument that these
additional assertions from his controverting statement of facts support an award of
18  punitive damages.  Plaintiff's citation to over fifty paragraphs in his controverting
statement of facts, without argument, does not establish an issue of fact to defeat
19  summary judgment.

20  [24]  The cases Plaintiff cites are distinguishable and do not support the assertion that
punitive damages are appropriate when a defendant/supervisor has received ADA
21  training.  In *Hemmings v. Tidyman's, Inc.*, 285 F.3d 1174, 1198 (9th Cir. 2002), the court
reinstated an award of punitive damages after finding the district court failed to apply the
22  standard set forth in *Kolstad*.  The evidence in that case demonstrated that the defendants
discriminated against the plaintiffs, based on gender, even after the plaintiffs served a
23  demand letter outlining their complaints of discrimination.  *Id.* at 1179-80.  In *Hemmings*,
the court does not discuss the training of the defendants.

24  In *Autozone,* the court upheld an award of punitive damages because the
defendants were aware of the plaintiff's disability, and did not dispute the medical
25  documentation of his injury, but repeatedly failed to provide the accommodations he
requested.  707 F.3d at 835-38.  In addition, the defendants did not follow their own
26  procedures for requests for accommodations, and only sent a letter to plaintiff authorizing
an accommodation *after* he suffered a disabling back injury and was placed on medical
27  leave.  *Id.* at 836  The court noted that the defendants' management employees had
received ADA training, but did not discuss this training in its analysis upholding the
28  punitive damages award or indicate that this training alone was sufficient to support an
award of punitive damages.  *Id.* at 835.

redress but to avoid harm.'"  *Id.* at 545 (citations omitted.)  Thus, authorizing punitive damages in this case based on Moore's testimony that she had some training on antidiscrimination laws, and provided some training to other VVAC employees, would undermine the policies underlying § 1981a.  Therefore, the Court finds that punitive damages are not authorized under § 1981a(b)(1), and Defendant is entitled to judgment as a matter of law on Plaintiff's demand for punitive damages.

Accordingly,

**IT IS ORDERED** that Plaintiff's Motion for Partial Summary Judgment (Doc. 37) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment (Doc. 40) is **DENIED** in part on the issues of disability, causation, and Plaintiff's GINA claims, and is **GRANTED** in part on Plaintiff's claim for punitive damages.

Dated this 10th day of September, 2014.


Bridget S. Bade
United States Magistrate Judge